**Kipley Wess KIRKLAND, Plaintiff,**

v.

**SSL AMERICAS, INC., and SSL U.S. Manufacturing, LLC, Defendants.**

**No. CIV.A. 02–A–1139–N.**

United States District Court, M.D. Alabama, Northern Division.

May 20, 2003.

on the phone and visited with friends. *Id.* at * 8.

Gary R. New, Robertson, Brunson & New, LLC, Eufaula, AL, D. Mitchell Henry, William H. Webster, Webster & Henry PC, Montgomery, AL, for Kipley Wess Kirkland, plaintiff.

Robert E. Rigrish, Jefferson B. Blandford, Ford & Harrison, Atlanta, GA, Steven Michael Stastny, Ford & Harrison LLP, Birmingham, AL, for SSL Americas, Inc., SSL U.S. Manufacturing, LLC, defendants.

## MEMORANDUM OPINION

ALBRITTON, Chief Judge.

### Introduction

This cause is before the court on the Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. # 16), filed by the Defendants', SSL Americas, Inc. ("SSL") and SSL U.S. Manufacturing, LLC ("SSL–US"), on January 31, 2003. Plaintiff Kipley Wess Kirkland ("Kirkland") originally filed this lawsuit in the Circuit Court for Barbour County, Alabama, on September 26, 2002. In his Complaint, Kirkland brings state law claims for breach of contract, fraud by suppression, unjust enrichment, fraud, deceit and fraudulent deceit, and conversion against SSL and SSL–US (collectively, "the Defendants"). These charges emerged from SSL–US's decision to deny Kirkland severance benefits after SSL–US sold the Eufaula, Alabama, manufacturing facility where Kirkland worked to Custom Services International, Inc. The Defendants removed this action to this court on October 7, 2002, (Doc. # 1), on the basis of federal question and diversity jurisdiction. The Defendants also contend that the federal Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, preempts Kirkland's state law claims. Kirkland has not filed a motion to remand.

After a careful and thorough review of the parties' submissions, the court concludes that the Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment is due to be GRANTED.

### Motion to Dismiss Standard

A court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations in the complaint. *See Hishon .v. King & Spalding,* 467 U.S. 69,

73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *see also Wright v. Newsome,* 795 F.2d 964, 967 (11th Cir.1986) ("[W]e may not … [dismiss] unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims in the complaint that would entitle him or her to relief.") (citation omitted). The court will accept as true all well-pleaded factual allegations and will view them in a light most favorable to the nonmoving party. *Hishon,* 467 U.S. at 73, 104 S.Ct. 2229; *Jackson v. Birmingham Bd. of Educ.,* 309 F.3d 1333, 1335 (11th Cir.2002). Furthermore, the threshold is "exceedingly low" for a complaint to survive a motion to dismiss for failure to state a claim. *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 703 (11th Cir.1985).

### Facts

SSL–US employed Kirkland as a salaried employee.[1] Kirkland worked at SSL–US's Dothan, Alabama, facility, and he transferred to SSL–US's Eufaula, Alabama, facility in May of 2000. SSL–US's employee policies and procedures covered Kirkland and listed his benefits. Among these employment policies and procedures, two are of particular importance to this case, Procedure 16 and Procedure 30. Procedure 16 originally was drafted on June 15, 1991, and was revised on November 28, 1995. Procedure 30 originally was authored on July 27, 1994, and was revised on November 30, 1994. Aladan Corporation ("Aladan") authored both the original policies and the revisions. At the time of the drafting of the procedures, Aladan owned the Eufaula facility. Aladan later sold the facility to London International Group, Inc. ("London"), which later became SSL–US. Both Procedure 16 and Procedure 30 were in force during the course of Kirkland's employment.

### Procedure 16

Procedure 16 has as its subject heading "Severance Benefits for Terminating Full–Time Salaried Exempt and Salaried Non–Exempt Employees." The language of the procedure provides three separate benefits to full-time salaried exempt and salaried non-exempt employees who are "terminat[ed] by company action other than for cause (elimination of position). An employee who is terminated by company action will receive the following severance benefits." Procedure 16, p. 1, Sec. II(A).

1. Salary continuation will be calculated at the regular salary rate based on the following guidelines:

 | 1. | Under $15,000 | 2 weeks pay |
 |----|---------------|-------------|
 | 2. | $15,000–$25,000 | 3 weeks pay |
 | 3. | $25,000–$40,000 | 4 weeks pay |
 | 4. | $40,000–$60,000 | 6 weeks pay |
 | 5. | $60,000–$80,000 | 8 weeks pay |
 | 6. | $80,000 and up | 10 weeks pay |

2. Compensation for length of service

 In addition to the aforementioned, length of service will be calculated at the rate of two weeks' pay at the regular rate for every full year employed with the Company, (rounded to the next year), without a break in service.

3. Continuation of insurance benefits

 Insurance benefits provided by the Company at the time of separation will remain in effect during the length of the salary continuation.

*Id.* at 1–2. Procedure 16 further states that no severance benefits will be paid to employees terminated for cause unless the terminated employee has a contract calling for the payment of severance benefits. *Id.* at 2. Procedure 16 also allows the company to offer severance benefits in "certain instances of voluntary separation." *Id.* If the company offers severance benefits in such a case, the benefits will be paid in

---

1. SSL–US is a subsidiary of SSL. SSL holds a 99% interest in SSL–US.

accordance with the schedule listed above. *Id.* Additionally, Procedure 16 states that "[n]o severance pay will be granted for resignation." *Id.* at 3.

Regarding administration, Procedure 16's language states that "[t]he Administrator of this Policy shall be [SSL–US's] Personnel Executive Committee. The primary responsibility of the Administrator is to administer the Policy for the exclusive benefit of the Participants, subject to the specific terms of the Policy." *Id.* The Administrator has "the power and discretion to construe the terms of the Policy and to determine all questions arising in connection with the administration, interpretation and application of the Policy." *Id.* at 4. The Administrator's decision shall be binding and conclusive on all parties. *Id.* Procedure 16 also contains a specific reference to ERISA:

> The Administrator may establish procedures, correct any defect, supply any information, or reconcile any inconsistency in such manner and to such extent as shall be deemed necessary or advisable to carry out the purpose of the Policy; provided, however that any procedure, discretionary act, interpretation or construction shall be done in a nondiscriminatory manner based upon uniform principles consistently applied and shall comply with the terms of ERISA and all regulations issued pursuant thereto.

*Id.* The Administrator has "the discretion to determine all questions relating to the eligibility of employees to participate or remain a participant hereunder and to receive benefits under the Policy." *Id.* Procedure 16 gives the Administrator the authority "to interpret the provisions of the Policy and to make and publish such rules for regulation of the Policy." *Id.* at 5.

### *Procedure 30*

Procedure 30 has as its subject title "Severance Allowance Policy." Under Procedure 30, SSL–US "may offer a sever-

ance allowance to all regular, full-time employees who are *involuntarily terminated due to a Company decision to close a plant/facility.*" Procedure 30, p. 1 (emphasis in original). Section I of Procedure 30 lists the requirements for eligibility for benefits:

A. The Company will pay [a] severance allowance to all regular, full-time employees who are involuntarily terminated *as a result of a Company decision to close a plant/facility.*

B. This severance allowance will not be paid if an employee leaves or is terminated for any of the following reasons:

1. Voluntary resignation prior to the Company-scheduled separation date.

2. Cause.

3. Excessive absenteeism/related attendance problems.

4. Unsatisfactory performance (as outlined in the Code of Conduct).

5. Retirement.

6. Disability/death.

7. Sale of the plant/facility whereby job continuation is offered under different ownership.

C. Temporary agency employees are not eligible for severance allowance.

D. An employee will not be paid severance if another job has been offered by the Company at any of its affiliates/divisions, and the offer has been accepted by the employee.

*Id.* at 1–2.

The amount of the severance allowance under Procedure 30 is determined according to the following chart:

| Years of Continuous Service | Weeks of Base Salary |
|---|---|
| Less than one year | 1 (one) |
| More than one year but less than two | 2 (two) |
| More than two years but less than three | 3 (three) |
| Three years and over | 4 (four) |

*Id.* at 2. Under the language of Procedure 30, the severance pay will be paid weekly

"at the same time that paychecks are normally processed." *Id.* at 3. While terminated employees are receiving severance pay pursuant to Procedure 30, SSL–US will continue to subsidize the employees' group health and dental insurance, and the employees remain eligible for SSL–US's profit incentive plan and 401(k) plan. *Id.* Procedure 30 also addresses the terminated employees' seniority: "The employee's seniority will terminate on the last day of *active* employment." *Id.* at 4 (emphasis in original).

The administration of Procedure 30 is identical to Procedure 16.[2] The Administrator[3] has "the discretion to determine all questions relating to the eligibility of employees to participate or remain a participant hereunder and to receive benefits under the" Procedure. *Id.* at 5. Procedure 30 also contains a reference to ERISA, using the same language as found in Procedure 16. *Id.* Under Procedure 30, as in Procedure 16, the Administrator's decision is final and binding. The Administrator has the discretion to construe the terms of Procedure 30.

### The Basis for Kirkland's Claims

In 1999, Kirkland was working for SSL–US in Dothan, Alabama. On September 23, 1999, SSL–US offered Kirkland a position as a Cost Accountant at the Eufaula facility. As part of Kirkland's move from Dothan to Eufaula, SSL–US and Kirkland entered into a contract on September 23, 1999, which set out the terms of Kirkland's new position. The contract was signed by Kirkland and by John D. Joyce on behalf of SSL–US (then London). Paragraph 6 of the contract states:

> If you decide to terminate your employment anytime within the first six (6) months after your transfer, you will receive any severance payment to which you are entitled. In the event that you are terminated by [SSL–US] prior to the end of the initial six (6) month period for any reason other than cause, you will also be entitled to your severance.

Kirkland transferred to the Eufaula facility in May of 2000. The six-month period discussed in paragraph 6 thus ran from May to November of 2000.

In September of 2000, SSL–US sold its Eufaula facility to Custom Services International, Inc. ("Custom"). Under the purchase agreement between SSL–US and Custom, Custom would retain most but not all of SSL–US's employees. In order to be considered for continued employment at the Eufaula facility under Custom's management, Kirkland had to fill out an employment application and undergo an interview process. Kirkland followed this process, submitted his application, and interviewed with Custom. Custom chose to hire Kirkland. Consequently, on September 7, 2000, "the employment relationship between ... Kirkland and SSL–US[ ] ended, and an employment relationship with [Custom] voluntarily began, without any interruption." Declaration of Lillie C. Thomas, ¶ 3.[4] On September 7, 2000, Kirkland's employment with SSL–US ended, and he immediately commenced his employment with Custom.

Kirkland's transition to Custom's employ was practically seamless. Kirkland did not miss a day of work and continued to receive a paycheck. Kirkland continued to perform the same duties for Custom as he had for SSL–US. He also received at least the same salary from Custom as he had received from SSL–US. Kirkland's

---

2. The language concerning the administration of both Procedures is identical.

3. As in Procedure 16, the Administrator is SSL–US's Personnel Executive Committee.

4. Thomas is a vice-president in Custom's management and is a vice-president in Custom's parent organization, LMR International. The Defendants submitted her declaration in support of their motion.

employment with Custom did, however, have some differences. Kirkland specifically noted seven changes:

1. Custom did not recognize his seniority for earned vacation benefits, and Kirkland only received seniority credit based on his date of hire with Custom, September 7, 2000.

2. Custom does not have a 401(k) plan. SSL–US had a 401(k) program and contributed $.50 for every dollar that an employee contributed up to 6% of the employee's pay.

3. SSL–US contributed an amount equivalent to 5% of an employee's pay to a retirement fund separate from SSL–US's 401(k) plan. Custom has no such plan.

4. Custom changed the healthcare provider for former SSL–US employees. According to Kirkland, during the transition former SSL–US employees who accepted employment with Custom were without healthcare coverage for a period of time.

5. Custom has no severance policy.

6. SSL–US provided cost of living salary increases in accordance with the federal government's cost of living increases. Custom provides no such increases.

7. SSL–US provided merit raises to employees on a yearly basis. According to Kirkland, since Custom took over the Eufaula facility, no employee who previously worked for SSL–US and who now works for Custom has received a merit raise.

Kirkland Affidavit, ¶¶ (a)-(g). Despite these changes in his employee benefits, Kirkland remains a Custom employee at the Eufaula facility, and, according to the Defendants, he has received a promotion and an increase in pay.

Of SSL–US's employees at the Eufaula facility, only four were not hired by Custom. Each of these four received severance benefits "pursuant to their respective severance agreements and/or the Policies." Roger O. Haviland Declaration, ¶ 6.[5]

Kirkland contends that he is entitled to severance benefits under Procedure 16 and Procedure 30. Kirkland's argument is that SSL–US terminated his employment on September 7, 2000, and that he is entitled to severance benefits under the Procedures and pursuant to his September 23, 1999 contract with SSL–US. The Defendants argue that Kirkland was not terminated on September 7, 2000, because his employment at the Eufaula facility did not end, and he did not miss a day of work. Additionally, the Defendants contend that the language of the Procedures specifically excludes Kirkland from eligibility for severance benefits. The Defendants also assert that the Procedures constitute an employee welfare benefit plan under ERISA, and that ERISA preempts Kirkland's state law claims.

### *Jurisdiction*

■ Before proceeding with the Defendant's motion on the merits, the court must be certain of its jurisdiction. As noted above, the Defendants removed this case to federal court on the basis of federal question and diversity jurisdiction. As of this date, Kirkland has not filed a motion to remand. In his response brief, Kirkland states that "[t]he parties have not engaged in discovery, which has been suspended on Kirkland's motion,[6] pending his

---

**5.** Roger O. Haviland is SSL's vice president for human resources.

**6.** Kirkland did file a Motion to Suspend Conference and Disclosure Requirements (Doc. # 11) on October 29, 2002. Magistrate Judge Coody denied the motion as premature on October 30, 2002. (Doc. # 12).

forthcoming motion to remand." Response Brief (Doc. # 23), p. 9. Kirkland's desire to file a motion to remand is curious, especially in light of the following facts.

Kirkland is a citizen of Alabama for diversity purposes. Complaint, ¶ 1. SSL is a New Jersey corporation with its principal place of business in Norcross, Georgia. SSL–US is a Delaware limited liability company with two members. The majority member, owning a 99% interest in SSL–US, is SSL. The minority member, owning a 1% interest in SSL–US, is LRC North America, Inc. ("LRC"). LRC is a Delaware corporation with its principal place of business in Delaware. *See* Declaration of Robert Kaiser (Doc. # 27), at 2. The Eleventh Circuit has yet to address how to determine the citizenship of an LLC for purposes of a diversity action, however, other federal courts generally agree that a limited liability company is a citizen of the state or states of which its members are citizens. *See, e.g., Handelsman v. Bedford Village Assocs., Ltd. P'ship*, 213 F.3d 48, 51–52 (2d Cir.2000); *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir.1998); *Birdsong v. Westglen Endoscopy Ctr., L.L.C.*, 176 F.Supp.2d 1245, 1248 (D.Kan.2001); *JBG/ JER Shady Grove, LLC v. Eastman Kodak Co.*, 127 F.Supp.2d 700, 701 (D.Md. 2001).

Consequently, Kirkland is diverse from each and every one of the Defendants. Kirkland has not limited his demand for damages to less than the statutory requirement of $75,000. Instead, Kirkland seeks punitive damages and damages for mental anguish and emotional distress. The Defendants have shown the court several cases from Alabama state courts in which plaintiffs have won jury verdicts well in excess of the jurisdictional require-

ment of $75,000 for claims involving fraud and emotional distress. *See* Notice of Removal (Doc. # 1), at 4 (citing *Ford Motor Co. v. Sperau*, 708 So.2d 111 (Ala.1997) (noting mental anguish damage award of $700,000 for two plaintiffs and punitive damage award of $6 million on a fraud claim); *Life Ins. Co. of Ga. v. Johnson*, 701 So.2d 524 (Ala.1997) (noting jury award of $250,000 in compensatory damages and $15 million in punitive damages for a fraud claim); *Duck Head Apparel Co. v. Hoots*, 659 So.2d 897 (Ala.1995) (noting mental anguish damage award of $6 million to three plaintiffs in a fraud case)). Alabama state courts have also awarded victorious plaintiffs in fraud cases punitive damages that exceed the jurisdictional minimum of $75,000. *See* Notice of Removal, at 4 (citing cases). Kirkland has neither challenged the Defendants' contention that the amount in controversy requirement is met nor sought to reduce his demand for damages to an amount below $75,000.

The court concludes that the Defendants have met their burden of proving by a preponderance of the evidence that the amount in controversy is greater than $75,000. *See Bolling v. Union Nat'l Life Ins. Co.*, 900 F.Supp. 400, 405 (M.D.Ala. 1995) ("This court holds that in a diversity case where no specific amount of damages is claimed in the complaint filed in state court, the removing defendant's burden is to establish by a preponderance of the evidence that the amount in controversy is greater than [$75,000] and that this may be done by sufficient proof that a plaintiff's verdict reasonably may exceed that amount."). With the amount in controversy requirement met and with the parties being completely diverse, the court concludes that all of the requirements for diversity jurisdiction are met.[7]

---

7. If Kirkland's claims are not preempted by ERISA, this court still has jurisdiction over them by virtue of the federal diversity jurisdiction statute, 28 U.S.C. § 1332.

### *Discussion and Analysis*

#### *Introduction*

In analyzing the Defendants' arguments that ERISA preempts Kirkland's state law claims, the court is confronted with three separate questions:

1. Do Procedure 16 and Procedure 30 constitute an "employee welfare benefit plan" under ERISA?

2. Does ERISA preempt all of Kirkland's state law claims, including his breach of contract claim relating to his September 23, 1999 contract with SSL–US's predecessor?

3. Is Kirkland required to exhaust his administrative remedies before he can file a lawsuit concerning SSL–US's denial of his claim for severance benefits?

The court will address each question in turn.

#### *1. Employee Welfare Benefit Plan?*

 The first question facing this court is whether Procedures 16 and 30 constitute an "employee welfare benefit plan" under ERISA, specifically 29 U.S.C. § 1002(1). Under § 1002(1), an "employee welfare benefit plan" is

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such a plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other train-

> ing programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1). The benefits listed under 29 U.S.C. § 186(c) [8] include severance benefits. *Donovan v. Dillingham,* 688 F.2d 1367, 1371 n. 4 (11th Cir.1982). The Eleventh Circuit has broken this statutory language into five separate requirements that a benefit plan must meet in order to be legally recognized as an "employee welfare benefit plan" under ERISA. The five requirements, as applicable to this case, are:

1. A plan, fund, or program

2. Established or maintained

3. By an employer or by an employee organization, or by both

4. To provide beneficiaries

5. With severance benefits

*See Butero v. Royal Maccabees Life Ins. Co.,* 174 F.3d 1207, 1214 (11th Cir.1999); *Smith v. Jefferson Pilot Life Ins. Co.,* 14 F.3d 562, 567 (11th Cir.1994); *Donovan,* 688 F.2d at 1371. Using these five prerequisites, the court will evaluate Procedures 16 and 30 to determine if they are "employee welfare benefit plans." *See Nix v. United Health Care of Ala., Inc.,* 179 F.Supp.2d 1363, 1366–67 (M.D.Ala.2001) (applying the five elements to determine if a plan is an "employee welfare benefit plan"); *Hardy v. Welch,* 135 F.Supp.2d 1171, 1179 (M.D.Ala.2000) ("The court will analyze whether the ... plan satisfies these five elements.").

---

**8.** Included in the benefits listed in 29 U.S.C. § 186(c) are "pooled vacation, holiday, sever- ance or similar benefits."

## A. Plan, Fund, or Program

The first element is whether Procedures 16 and 30 constitute a plan, fund, or program. An ERISA plan, fund, or program is present whenever "from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Donovan*, 688 F.2d at 1373.[9] The court thus must look to Procedures 16 and 30 to determine if a reasonable person could ascertain from the surrounding circumstances the intended benefits, the intended class of beneficiaries, the source of financing, and the procedures for receiving benefits. *See id.* at 1372 (noting that "ERISA does not ... require a formal written plan").

## I. Intended Benefits

The language in both Procedure 16 and Procedure 30 clearly delineates the intended benefits. Procedure 16 has a salary chart that correlates an employee's annual salary to the amount of weeks that the employee will receive in the event the company terminates the employee by company action other than for cause. Procedure 16, at 2. Procedure 16 also states that length of service will be compensated at the "rate of two weeks pay at the regular rate for every full year employed with the Company (rounded to the next year), without a break in service." *Id.* at 3. Procedure 16's plain language also explains that insurance benefits will be continued for employees who continue to receive their salary under Procedure 16's severance benefits. *Id.* Likewise, Procedure 30 provides a chart which correlates an employee's length of service with the number of weeks of pay the employee is eligible to receive. Procedure 30, at 2. Procedure 30 also states that the company will "continue to subsidize the cost of terminating employees' group health and dental insurance throughout the time they receive severance pay." *Id.* at 3. From the language of each procedure, a reasonable employee could determine the intended benefits to be provided under Procedure 16 and Procedure 30.

## II. Intended Beneficiaries

Both Procedure 16 and Procedure 30 explicitly list the class of intended beneficiaries eligible to receive benefits under each procedure. Procedure 16's language provides that "[f]ull-time salaried exempt and salaried non-exempt employees" are eligible for severance benefits under Procedure 16. Procedure 16, at 1. The terms of Procedure 16 specifically exclude hourly, part-time, and temporary salaried employees from eligibility for severance benefits under Procedure 16. *Id.* Procedure 30 limits severance benefits only to those "regular, full-time employees who are *involuntarily terminated as a result of a Company decision to close a plant/facility.*" Procedure 30, at 1 (emphasis in original). Temporary employees are not eligible for severance benefits under Procedure 30. *Id.* at 2. Additionally, Procedure 30 lists seven situations in which severance benefits will not be paid.[10] *Id.* at 1–2. From the terms of Procedure 16 and Procedure 30, a reasonable employee could determine the class of intended recipients for severance benefits under the procedures.

---

9. Several federal appellate courts have relied on the *Donovan* test for a "plan, fund, or program." *See Deibler v. United Food & Commercial Workers' Local Union 23*, 973 F.2d 206, 209 (3d Cir.1992); *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1083 (1st Cir.1990); *Brown v. Ampco–Pittsburgh Corp.*, 876 F.2d 546, 551 (6th Cir.1989); *Harris v. Ark. Book Co.*, 794 F.2d 358, 360 (8th Cir.1986).

10. The seven conditions are listed on page 5 of this Memorandum Opinion.

### III. Source of Financing

The source of financing for the severance benefits under Procedures 16 and 30 is SSL–US. Procedure 30 expressly states that "[t]he Company will pay severance" benefits to eligible employees. Procedure 30, at 1. While Procedure 16 does not explicitly list a source of financing for its severance benefits, a reasonable person could ascertain from the surrounding circumstances that the source of funding for the severance benefits is SSL–US. Procedure 16 states that the benefits to be paid constitute "salary continuation," a continuation of a salary previously paid by SSL–US. Procedure 16, at 1. Furthermore, Procedure 16 explains that "[i]nsurance benefits *provided by the Company* at the time of separation will remain in effect during the length of the salary continuation." *Id.* at 2 (emphasis added). From the language in Procedure 16, a reasonable employee could determine that SSL–US provides the financing for both salary and insurance benefits under the severance plan.

### IV. Procedures

The procedures for applying for and receiving benefits under Procedure 16 and Procedure 30 are outlined in only general terms in both procedures. Procedure 16 merely states that "[a]n employee who is terminated by company action will receive ... severance benefits." Procedure 16, at 1. Procedure 30 is somewhat more specific, explaining that "[s]everance allowance ... will be sent out on a weekly basis (at the same time that paychecks are normally processed)." Procedure 30, at 3. Procedure 30's language also implies that the payroll department will have a role in processing and issuing severance benefits: "The payroll department will withhold appropriate FICA, Federal, State and any other required taxes from all severance allowance payments." Despite the aforementioned terms in the procedures, nei-

ther Procedure 16 nor Procedure 30 expressly explains what an employee must do to apply for and receive benefits under the procedures. Before the court can reach the conclusion that Procedure 16 and Procedure 30 fail the fourth prong of the *Donovan* test, however, the court must faithfully apply the reasonable person test as outlined in Donovan. *See* 688 F.2d at 1373.

To determine if a reasonable employee could ascertain the procedures for applying for and receiving benefits under Procedure 16 and Procedure 30, the court will focus its analysis on Kirkland's knowledge, whether actual or imputed, about SSL–US's administrative claims process. First, the court notes that if an employee has filed an administrative claim for severance benefits, the claim is evidence that the employee could reasonably ascertain the procedures for applying for and receiving severance benefits. *See Butero,* 174 F.3d at 1214; *Hardy,* 135 F.Supp.2d at 1179. In *Butero,* the Eleventh Circuit found that the fourth prong of the *Donovan* test was satisfied when "a 'reasonable person' could figure out procedures for receiving benefits (certainly Butero did here, for [her employer] filed an insurance claim on her behalf)." 174 F.3d at 1214. In *Hardy,* United States District Judge Myron H. Thompson concluded that the fourth *Donovan* prong was satisfied because "the Hardys did figure out the procedure for receiving benefits because each of them filed a claim for benefits." 135 F.Supp.2d at 1179. In the instant case, however, Kirkland has not filed an administrative claim for benefits. Kirkland's failure to file an administrative claim does not automatically lead to the conclusion that a reasonable person could not ascertain the procedures for applying for and receiving severance benefits under Procedures 16 and 30. Kirkland's failure to file an administrative

claim could be the result of negligence or a deliberate decision not to file for benefits.

The parties' briefs are unhelpful on this point.[11] Both Kirkland and SSL and SSL–US have noted Kirkland's failure to file an administrative claim with SSL–US in an effort to obtain severance benefits. Yet, both parties discuss the issue in dealing with the question of whether Kirkland had to administratively exhaust all of his appeals procedures with SSL–US before filing a lawsuit instead of in addressing the question of whether Procedure 16 and Procedure 30 constitute an ERISA employee welfare benefit plan. The Defendants cite *Perrino v. Southern Bell*, 209 F.3d 1309 (11th Cir.2000), and *Counts v. American General Life & Accident Insurance Co.*, 111 F.3d 105 (11th Cir.1997), for the proposition that the failure of Procedure 16 and Procedure 30 to comply with the fourth prong of the *Donovan* test does not exempt the Procedures from coverage under ERISA.[12]

In *Perrino*, the question of whether the benefits package at issue was an employee welfare benefit plan under ERISA was never in doubt. The court noted in two places in the opinion that the benefit plan was an employee welfare benefit plan under ERISA. *See Perrino*, 209 F.3d at 1311 ("The plaintiffs had sought a termination pay allowance based on a provision of the agreement-a provision which constituted, as BellSouth concedes, an ERISA welfare benefits plan."); *id.* at 1315 ("Both parties also concede that this Agreement constituted an ERISA plan for the relevant time period."). The *Perrino* court went on to conclude that the plaintiffs must exhaust their administrative remedies regardless of the ERISA plan's technical noncompliance with federal statutes and regulations. *Id.* at 1317. The *Perrino* decision, while instructive on the issue of exhaustion of administrative appeals, is not helpful to this court in determining whether Procedure 16 and Procedure 30 constitute an ERISA employee welfare benefit plan.

Like *Perrino*, the issue of whether a benefits plan was an ERISA employee welfare benefits plan was not in question

---

**11.** Specifically, the court notes that Defendants' Memorandum of Law in Support of Their Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. # 17) states that "[t]he Eleventh Circuit has held that an ERISA plan *implies the existence of intended* benefits, intended beneficiaries, and a source of financing. *Donovan v. Dillingham*, 688 F.2d 1367 (1982)." Doc. # 17, p. 8. This statement clearly and conveniently leaves out the fact that the *Donovan* court enunciated a four-part test which states "whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, *and procedures for receiving benefits.*" *Donovan*, 688 F.2d at 1373 (emphasis added). The *Donovan* court not only used this language on page 1373 but also utilized it on page 1372. On page 1372, the court used the following language: "At a minimum, however, a 'plan, fund, or program' under ERISA implies the existence of intended benefits, intended beneficiaries, a source of financing, and *a proce-*

*dure to apply for and collect benefits.*" *Id.* at 1372 (emphasis added).

Plaintiff's Response Brief (Doc. # 23) does not address the issue of the procedures for applying for and receiving benefits in the context of discussing whether Procedure 16 and Procedure 30 are ERISA employee welfare benefit plans.

**12.** In their Reply Brief, the Defendants seek to use *Perrino* and *Counts* to argue both that: 1) the failure of a benefits package to have a procedure for applying for and receiving benefits does not prevent the benefits package from being an ERISA plan, and 2) the failure of Procedures 16 and 30 to have an administrative appeals process set forth in writing does not excuse the requirement that an employee must exhaust all administrative avenues before pursuing a lawsuit. The court concludes that *Perrino* and *Counts* supports the latter contention, but they do not support the former.

in *Counts*. The *Counts* court explained that the plaintiff "was a participant in the ... [l]ong-[t]erm [d]isability [p]lan ... an employee benefit plan governed by ERISA." 111 F.3d at 107. While the *Counts* opinion may be useful in analyzing administrative exhaustion issues, it is unhelpful in assisting this court in deciding whether Procedure 16 and Procedure 30 are ERISA employee welfare benefit plans.

While Kirkland did not file any administrative claim for benefits with SSL–US, the plaintiffs in *Barnes v. SSL Americas, Inc.*, CV 02–A–1141–N, a companion case to Kirkland's, did file claims. On September 28, 2001, attorney Randy B. Blake ("Blake") filed a "formal demand that the severance benefits be paid" on behalf of Dorothy Barnes and twenty-six other former SSL–US employees. *See* Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. # 16), Exhibit F, Blake letter of Sept. 28, 2001, p. 2. Blake filed the claims with Robert Kaiser ("Kaiser"), vice president and general counsel for SSL. Kaiser passed these claims to Roger Haviland ("Haviland"), SSL's vice president for human resources.

Blake next received a letter dated October 22, 2001, from Sean McDevitt ("McDevitt") of the law firm Pepper Hamilton LLP in Berwyn, Pennsylvania. McDevitt informed Blake that he and his firm represented SSL. McDevitt explained that Blake's letter and the claims of the *Barnes* plaintiffs would be forwarded to the SSL–US benefits committee. McDevitt also stated in his letter that "[i]n accordance with the required procedures governing benefit claims under the Employee Retirement Income Security Act of 1974, as amended, you should expect to hear from that Committee on or before December 28, 2002."[13] *See* Defendants' Motion

to Dismiss or, in the Alternative, for Summary Judgment (Doc. # 16), Exhibit F, McDevitt letter of Oct. 22, 2001, p. 1.

Haviland responded to Blake's letter on November 19, 2001, by telling Blake that the claims had "been forwarded to me for determination." *See* Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. # 16), Exhibit F, Haviland letter of Nov. 19, 2001, p. 1. Haviland stated that he was "the Plan Administrator for certain of the employee benefit plans and policies maintained by SSL Americas, Inc. and certain of its subsidiaries and affiliates." *Id.* Haviland asked for more information from Blake and the *Barnes* plaintiffs, particularly copies of the benefit plans, identification of the terms in the procedures upon which the *Barnes* plaintiffs relied in their claims for benefits, and relevant facts supporting each individual claim. *Id.*

Blake sent Haviland the additional requested information on November 29, 2001. On December 20, 2001, Haviland denied the *Barnes* plaintiffs' claims in a letter to Blake.

> Pursuant to the powers delegated to me under the Policy, I interpret the Policy as *not* providing severance benefits for former employees of [SSL–US] who are transitioned from employment by [SSL–US] to a successor entity in connection with the sale of assets by [SSL] to such entity when the primary employment responsibilities of such former employees relate to such assets. In such instances, there has not been an "elimination of position" within the meaning of the Policy that is a condition to [SSL–US's] obligation to provide severance under the policy.

---

**13.** It appears that McDevitt listed the wrong date, using the year 2002 instead of 2001. December 28, 2002, was fourteen months from the date McDevitt wrote the letter, October 22, 2001.

Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. # 16), Exhibit F, Haviland letter of Dec. 20, 2001, at 3 (emphasis in original). Haviland's letter further outlined the procedure for the Barnes' plaintiffs to appeal his decision.

> Pursuant to Section 503 of the Employee Retirement Income Security Act of 1974, as amended, each claimant has the right to appeal this decision by sending written notice to me, in my capacity as the Plan Administrator, at the address above. Any such appeal should specifically outline the reason(s) why any such claimant believes one or more of the determinations set forth in this letter are erroneous. Any appeal must be mailed no later than 60 days following the receipt of this determination. Untimely appeals will not be reviewed.
>
> . . . . .
>
> Following an adverse benefit determination on appeal, each such claimant will have a right to bring a civil action under Section 502(a) of ERISA in an appropriate federal district court.

*Id.* at 3–4.

Despite the lack of language in either Procedure 16 or Procedure 30 outlining the administrative process for applying for and receiving benefits, the *Barnes* plaintiffs were able to file an administrative claim with SSL–US, and ascertain the procedures for applying for and receiving benefits under the procedures. While Blake represented the *Barnes* plaintiffs in their administrative claim and appeal, Gary R. New ("New") and William H. Webster ("Webster") represent the *Barnes* plaintiffs in their civil action against SSL and SSL–US in federal court. New and Webster also represent Kirkland in this action.

In the course of their representation of the *Barnes* plaintiffs, New and Webster have had the time to obtain and review the letters Blake drafted on behalf of the *Barnes* plaintiffs.[14] Those letters and Haviland's response provide evidence of the proper procedures for applying for benefits under Procedure 16 and Procedure 30. Consequently, New and Webster have knowledge of the proper procedures to apply for severance benefits with SSL–US. Such knowledge must be imputed to their client Kirkland. *See Link v. Wabash R.R.*, 370 U.S. 626, 633–34, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) ("Petitioner voluntarily chose this attorney as his representative in this action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.' ") (quoting *Smith v. Ayer*, 101 U.S. 320, 326, 11 Otto 320, 25 L.Ed. 955 (1879)); *see also Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (citing *Link* for the proposition that counsel's actions or inactions are imputed to the client); *United States v. Arnold*, No. 5:99–cv–161–OC–21GRJ, 2001 WL 34106906 at *8 (M.D.Fla. Aug. 15, 2001) ("[T]he Supreme Court has held that clients must be held accountable for the acts and omissions of their attorneys." (citing *Link* )).

From the foregoing discussion, the court concludes that the fourth prong of the *Donovan* test is satisfied. Kirkland could reasonably ascertain the procedures for applying for and receiving benefits under

---

**14.** Even if New and Webster have not previously seen any of the correspondence between Blake and Haviland, the Defendants attached the correspondence in support of their motion to dismiss.

Procedure 16 and Procedure 30. Other courts have reached similar conclusions. *See, e.g., Deibler v. United Food & Commercial Workers' Local Union 23*, 973 F.2d 206, 210 (3d Cir.1992) ("It is true that the source of financing and the procedure for receiving benefits were never made explicit, but it is enough if these can be ascertained from the surrounding circumstances." (quoting *Donovan*, 688 F.2d at 1373)); *Petersen v. E.F. Johnson Co.*, No. 02–333, 2002 WL 1975907, at *2 (D.Minn. Aug. 23, 2002) ("[W]hile the Program does not explicitly contain procedures for receiving benefits, a reasonable person could ascertain the informal procedures to follow."); *Whitfield v. Torch Operating Co.*, 935 F.Supp. 822, 828 (E.D.La.1996) (finding that the fourth *Donovan* prong was satisfied when "the source of financing and procedures for receiving benefits are also gleaned from the prior terminations [of employees].... [t]he procedure for their receipt was, at most, no more than a simple request by the involuntarily terminated employees."); *Bongiorno v. Assocs. in Adolescent Psychiatry, S.C.*, No. 93 C 2740, 1993 WL 313096, at *4 (N.D.Ill. Aug. 13, 1993) ("Although no procedure for paying out the money is specified, it can be assumed that the departing employee should apply to the personnel department or whomever ordinarily handles distribution of pay or benefits."); *Purser v. Enron Corp.*, No. 88–1117, 1988 WL 220238, at *3 (W.D.Pa. Dec. 5, 1988) (explaining that the fourth *Donovan* prong is satisfied when "the agreement outlines the method of computing benefits due upon certain specifically identified events, thus clarifying for plaintiff the procedure which he should follow in attempting to obtain his claimed benefits").

With Procedure 16 and Procedure 30 having satisfied all four prongs of the *Donovan* test, the court determines that the procedures are a "plan, fund, or program" within the meaning of 29 U.S.C. § 1002(1).

*See Donovan*, 688 F.2d at 1370–71. The court must now determine if the procedures meet the other four requirements discussed above and listed in *Butero*. *See Butero*, 174 F.3d at 1214 (listing four remaining requirements).

### B. Established or Maintained

The next requirement is that Procedures 16 and 30 be "established or maintained." According to the *Butero* court, "[a] plan is 'established' when there has been some degree of implementation by the employer beyond a mere intent to confer a benefit." 174 F.3d at 1214; *see Donovan*, 688 F.2d at 1373 ("Acts or events that record, exemplify or implement the decision will be direct or circumstantial evidence that the decision [to establish a plan] has become reality."). SSL–US has satisfied this requirement by paying out benefits under the procedures to four employees who did not retain their jobs after Custom took over the Eufaula manufacturing facility. *See* Roger O. Haviland Declaration, ¶ 6. This payment of benefits under the severance policies is evidence that SSL–US took steps to "establish" the procedures beyond simply announcing its intention, in writing, to provide severance benefits. This evidence is sufficient to show that SSL–US "established" the severance procedures. *See Nix*, 179 F.Supp.2d at 1367 (concluding that evidence that the employer paid insurance premiums for an employee benefit plan indicated that the employer "established" the plan).

### C. By an Employer

The third requirement listed in *Butero* is that the severance plan is established by an employer. This requirement is satisfied. Although Aladan drafted both Procedure 16 and Procedure 30, both procedures were adopted by SSL–US when it took over the management of the Eufaula facility. SSL–US, as the former employer to four employees who did not continue work-

ing at the Eufaula facility after Custom purchased it from SSL, paid severance benefits to the four former employees. Furthermore, in his declaration, Haviland stated that "[d]uring its former operation" of the Eufaula facility, SSL–US "maintained ... Procedure 16 and ... Procedure 30" for its employees. Roger O. Haviland Declaration, ¶ 2.

### D. To Provide Beneficiaries

The fourth and fifth *Butero* requirements are that the procedures were established "to provide beneficiaries" with severance benefits. 174 F.3d at 1214. The language of Procedure 16 and Procedure 30 plainly list the employees who are eligible as beneficiaries to receive benefits. Procedure 16 limits the benefits to "Full-Time Salaried Exempt and Salaried Non-Exempt Employees." Procedure 16, at 1. Procedure 30 limits the class of beneficiaries to "all regular, full-time employees who are involuntarily terminated *as a result of a Company decision to close a plant/facility.*" Procedure 30, at 1 (emphasis in original). Each procedure also lists categories of employees who are excluded from the class of beneficiaries. Procedure 16 specifically explains that "[h]ourly employees, part-time employees and temporary salaried employees are not eligible for any severance benefits." Procedure 16, at 1. Procedure 30 excludes employees from the class of beneficiaries if they voluntarily resign or retire; are terminated for cause, attendance problems, or poor performance; are disabled; or are offered "job continuation ... under different ownership." Procedure 30, at 1–2. Temporary employees are also excluded from the class of beneficiaries under Procedure 30. *Id.* at 2. Both procedures satisfy the requirement of identifying a class of beneficiaries eligible to receive benefits.

### E. With Severance Benefits

Finally, each procedure also outlines the proposed severance benefits. These have been discussed previously on pages 3 and 5 of this Memorandum Opinion. Under each procedure, an employee within the class of beneficiaries can expect to receive a set amount of his or her salary depending on the employee's length of service or salary rate. Each procedure thus provides severance benefits, fulfilling the final *Butero* factor. *See* 174 F.3d at 1214; *Nix,* 179 F.Supp.2d at 1367; *Hardy,* 135 F.Supp.2d at 1180.

With all five *Butero* factors satisfied, the court concludes that Procedures 16 and 30 constitute an ERISA employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1). The decisions of other courts which have confronted the question of whether benefit plans similar to SSL–US's are employee welfare benefit plans also support the court's decision in this case. For example, in *Holland v. Burlington Industries, Inc.,* 772 F.2d 1140, 1143–44 (4th Cir.1985), *aff'd sub nom. Brooks v. Burlington Industries, Inc.,* 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986) (mem.), the Fourth Circuit reviewed a severance pay plan for salaried employees to determine if the plan was an ERISA employee welfare benefit plan. The plan at issue provided that "full time employees who involuntarily leave the company" would be paid between two weeks and twelve months of severance pay based on the "employee's age and length of service." *Id.* at 1143–44. The plan also contained language limiting eligibility for the plan to employees who suffered "job termination." *Id.* at 1144. The company's policy manual described "job termination" as including "terminations due to circumstances such as elimination or modification of operations or other job elimination due to bona fide organizational changes." *Id.*

In 1982, Burlington Industries sold its Socks and Hosiery Divisions to Kayser–Roth as going concerns. *Id.* at 1143. Kayser–Roth offered employment to all of

the two hundred plaintiffs in the *Holland* case, all of whom continued to work with- out interruption. *Id.* Kayser–Roth did not offer employment to five Burlington Indus- tries employees from the Socks and Ho- siery Divisions. *Id.* Those five employees received severance benefits under Burling- ton Industries' severance benefit plan. *Id.* The plaintiffs sought severance benefits from Burlington Industries under the sev- erance plan. *Id.* at 1144. Burlington de- nied the plaintiffs the benefits, contending that "there had been no 'job elimination' as required by the ... [m]anual." *Id.*

Burlington removed the plaintiffs' action to federal court, arguing that the plaintiffs were seeking benefits under an ERISA plan. *Id.* The Fourth Circuit agreed with Burlington. *Id.* "ERISA governs employ- er severance pay plans whether funded from general assets ... or from a special trust." *Id.* The court rejected the conten- tion that Burlington's severance benefits plan was a "payroll practice" defined in the Department of Labor's regulations at 29 C.F.R. § 2510.3–1. *Id.* at 1145. In reach- ing the conclusion that Burlington's sever- ance benefits plan was an ERISA plan, the court noted that the statutory language of 29 U.S.C. § 1002(1)[15] encompasses sever- ance benefits under the ERISA umbrella. *See id.* (citing cases supporting the propo- sition that severance benefit plans are ERISA plans). The court next explained that the fact that Burlington would pay severance benefits out of its general assets instead of a special trust fund did not keep the severance benefit plan from being an

ERISA plan. *Id.* Finally, the Fourth Cir- cuit concluded that the payment of sever- ance benefits is not a "payroll practice" for the simple reason that the federal regula- tions defining a "payroll practice" specifi- cally did not include severance benefits as a "payroll practice." *Id.* at 1146.[16]

The *Holland* court concluded that Bur- lington's severance benefit plan was an ERISA employee welfare benefit plan. The court noted that "Congress deter- mined as a matter of policy that severance pay benefits should be subject to ERISA." *Id.* at 1146. The Supreme Court affirmed the *Holland* court's conclusion. *See Brooks,* 477 U.S. at 901, 106 S.Ct. 3267.

Eleventh Circuit case law also lends support to this court's conclusion that Pro- cedure 16 and Procedure 30 are ERISA plans. In *Bedinghaus v. Modern Graphic Arts,* 15 F.3d 1027, 1027–28 (11th Cir. 1994), the court noted that the following plan was "governed by the Employee Re- tirement Income Security Act of 1974:"

> If, after the first six months [of employ- ment], you are discharged as a full-time staffer for reasons other than cause ..., the company will pay you 1 week's pay- in-lieu of notice for each 6 months of service. This amounts to 2 weeks' pay for 1 year of service, 10 weeks' pay for 5 years of service, etc. No pay-in-lieu of notice is paid for less than six months' service, nor for fractional parts of six- months periods.

*Id.* at 1028.[17] Like *Bedinghaus,* the sever- ance benefits plan in *Adams v. Thiokol*

---

**15.** *See supra* pages 1333–1334 of this Memo- randum Opinion for the language of 29 U.S.C. § 1002(1).

**16.** 29 C.F.R. § 2510.3–1(b) lists several "pay- roll practices" that are not considered "em- ployee welfare benefit plans." Included in these practices are an employer's decision to provide overtime pay, vacation pay, pay for employees on active duty with the armed forces, pay for employees testifying in official

proceedings or serving as jurors, pay for training time, and pay for an employee who takes time away from his or her job to pursue higher education. Severance pay is not listed as a "payroll practice" under § 2510.3–1(b).

**17.** The *Bedinghaus* court did not confront specifically the same issue before this court, namely whether the severance plans at issue constitute an ERISA plan. Instead, the court was reviewing the district court's decision

*Corp.*, 231 F.3d 837, 840–41 (11th Cir. 2000), was governed by ERISA. Under the plan, Thiokol would provide severance benefits "to employees who would involuntarily lose their jobs due to a reduction in work force." *Id.* at 840. The plan also included language excluding severance benefits for "termination of employment resulting from ... (ii) the sale of all or part of the business assets of the Company or a subsidiary or a business unit; ... or (iv) any other form of reorganization including a spinoff; and the employee is offered a position (whether or not such position is comparable to the prior position) by the acquiring or resulting company." *Id.* at 840–41. The *Adams* court specifically noted, in dicta, that "a severance pay plan is an 'employee welfare benefit plan,' as defined under ERISA." *Id.* at 841.[18]

Support for this court's decision that Procedures 16 and 30 are ERISA employee welfare benefit plans can also be found in a decision by the Supreme Court. In *Massachusetts v. Morash*, 490 U.S. 107, 116, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989), the Supreme Court stated, albeit in dicta, that "plans to pay employees severance benefits, which are payable *only* upon termination of employment, are employee welfare benefit plans within the meaning of [ERISA]." (citing *Holland* ) (emphasis in original). In *Morash*, the Supreme Court concluded that an employer's plan to pay accrued vacation pay to terminated employees was not an ERISA plan. *Id.* at 119–21, 109 S.Ct. 1668. The Court reached this conclusion by distinguishing severance benefit plans from vacation benefit plans. *Id.* at 116–18, 109 S.Ct. 1668. Due to the fact that vacation pay is earned

as part of an employee's regular compensation and the fact that if an employee is terminated before being able to utilize either his vacation time or vacation pay, any plan that pays any accrued vacation pay to the employee is simply paying deferred compensation. *Id.* at 119–21, 109 S.Ct. 1668. In contrast, severance pay is not deferred compensation and is payable only in prescribed situations where the employee loses his job. *Id.* at 120, 109 S.Ct. 1668.

Kirkland attempts to rely on Supreme Court precedent as well. He argues that *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), and its progeny support his view that Procedures 16 and 30 are not ERISA employee welfare benefit plans. The court disagrees. In *Fort Halifax*, the Supreme Court concluded that a Maine statute which required "employers to provide a one-time severance payment to employees in the event of a plant closing" was not preempted by ERISA. *Id.* at 3–4, 107 S.Ct. 2211. In so concluding, the Supreme Court found that the Maine statute did not create an employee benefit plan because the statute did not require on-going administrative requirements for the employers. *Id.* at 6–7, 11–12, 107 S.Ct. 2211. The statute at issue in *Fort Halifax* simply created an employee benefit, i.e. a one-time severance payment, instead of an employee benefit plan. *Id.* at 12, 107 S.Ct. 2211.

In contrast, Procedure 16 and Procedure 30 require SSL–US to maintain an ongoing administrative scheme to provide the promised severance benefits. Both procedures state that insurance benefits will be continued while an employee receives sev-

---

affirming the employer's interpretation of a benefit plan governed by ERISA. *See* 15 F.3d at 1029. Nonetheless, the *Bedinghaus* decision remains instructive because its facts parallel many of the facts in the instant case.

18. Like *Bedinghaus*, the *Adams* court was reviewing the administrator's interpretation of the severance benefits plan and was not deciding whether the plan was an employee welfare benefit plan under ERISA.

erance pay. Under these provisions, SSL–US must determine the number of weeks that an employee will receive severance benefits and must insure that any insurance benefits provided to the employee continue for the duration of the severance payments. With each employee potentially entitled to a different number of weeks of severance pay, the administrative oversight required to guarantee that insurance benefits are paid for the correct length of time for each employee is substantial. Under Procedure 30, SSL–US must maintain records for employees who continue to participate in SSL–US's profit incentive plan and 401(k) plan. The Maine statute at issue in *Fort Halifax* did not require similar burdens for Maine employers. As a result, the severance benefits at issue in this case are materially different from the one-time, statutorily-mandated severance benefits discussed in *Fort Halifax*.

In conclusion, the court determines that Procedures 16 and 30 are ERISA employee welfare benefit plans. Accordingly, the court must next ascertain whether federal ERISA law preempts any or all of Kirkland's state law claims.

### 2. Preemption

In *Butero*, the Eleventh Circuit explained the mechanics of the two types of ERISA preemption:

The first kind is what this circuit has called complete preemption or "superpreemption." *Whitt v. Sherman Int'l Corp.*, 147 F.3d 1325, 1329 (11th Cir. 1998). Superpreemption arises from Congress's creation of a comprehensive remedial scheme in 29 U.S.C. § 1132 for loss or denial of employee benefits. *See Metro[.] Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–64, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). When Congress comprehensively occupies a field of law, "any civil complaint raising this select group of claims is necessarily federal in character" and thus furnishes subject-matter

jurisdiction under 28 U.S.C. § 1331. *Id.* Therefore, federal courts have subject-matter jurisdiction over state-law claims that have been superpreempted, and defendants may remove to federal court those actions that contain such claims. *See id.*

The second kind of preemption we will call "defensive." It originates in ERISA's express preemption provision, 29 U.S.C. § 1144(a). Defensive preemption provides only an affirmative defense to certain state-law claims. *See id.* As an affirmative defense, defensive preemption does not furnish federal subject-matter jurisdiction under 28 U.S.C. § 1331; "a cause of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of federal law." *Id.* at 63, 107 S.Ct. 1542. On the other hand, defensive preemption does require dismissal of state-law claims. *See id.*

*Butero*, 174 F.3d at 1211–12; *see also Bridges v. Principal Life Ins. Co.*, 132 F.Supp.2d 1325, 1327–28 (M.D.Ala.2001) (Albritton, C.J.) (explaining complete preemption doctrine).

As explained above, this court already has subject-matter jurisdiction over Kirkland's claims by reason of diversity. There is no need for the court to analyze Kirkland's claims in light of the complete preemption doctrine for the sole purpose of establishing this court's jurisdiction. The court will, however, undertake an analysis of whether Kirkland's state law claims are completely preempted for two reasons: 1) If a claim is completely preempted, it is also defensively preempted, *see Butero*, 174 F.3d at 1215 (citing *McClelland v. Gronwaldt*, 155 F.3d 507, 517 (5th Cir.1998)), and 2) If Kirkland's claims are completely preempted, the court can grant Kirkland the opportunity refile his Complaint in federal court and

pursue his federal claims under ERISA, specifically 29 U.S.C. § 1132. *See Butero,* 174 F.3d at 1215.

 Kirkland brings state law claims for breach of contract, fraud by suppression, unjust enrichment, fraud, deceit and fraudulent deceit, and conversion against the Defendants. Each of these claims relates either to the ERISA plans of Procedure 16 and Procedure 30 or to the September 23, 1999 contract between Kirkland and SSL–US. The *Butero* court explained the requirements for complete preemption:

> Here's the rule: ERISA superpreemption exists only when the "plaintiff is seeking relief that is available under 29 U.S.C. § 1132(a)." *Whitt,* 147 F.3d at 1330. Regardless of the merits of the plaintiff's actual claims (recast as ERISA claims), relief is available and there is complete preemption, when four elements are satisfied. First, there must be a relevant ERISA plan. *See id.; Kemp v. [Int'l Bus. Machs.] Corp.,* 109 F.3d 708, 713 (11th Cir.1997). Second, the plaintiff must have standing to sue under that plan. *See Engelhardt v. Paul Revere Life Ins. Co.,* 139 F.3d 1346, 1350 n. 3 (11th Cir.1998). Third, the defendant must be an ERISA entity. *See id.; Franklin v. QHG of Gadsden, Inc.,* 127 F.3d 1024, 1029 (11th Cir.1997); *see also Morstein v. [Nat'l] Ins. Servs., Inc.,* 93 F.3d 715, 722 (11th Cir.1996) (en banc) (no preemption at all-not even defensive preemption-when the defendant is "a non-ERISA entity" and the claims do not "affect relations among principal ERISA entities as such"). Finally, the complaint must seek compensatory relief akin to that available under § 1132(a); often, this will be a claim for benefits due under a plan. *See Engelhardt,* 139 F.3d at 1354; *Franklin,* 127 F.3d at 1029.

*Butero,* 174 F.3d at 1212; *see also Bridges,* 132 F.Supp.2d at 1328.

Using the four factors outlined by the *Butero* court, this court concludes that Kirkland's state law claims relating to Procedure 16 and Procedure 30 are completely preempted by ERISA. As to the first factor, as previously discussed in this Memorandum Opinion, Procedure 16 and Procedure 30 constitute an ERISA employee welfare benefit plan. For the second factor, Kirkland, as a full-time salaried employee at SSL–US's Eufaula facility, is a beneficiary under both Procedure 16 and Procedure 30. ERISA's language in 29 U.S.C. § 1002(8) defines a beneficiary as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." SSL–US has denied Kirkland the severance benefits he seeks, and, thus, he has standing to sue under SSL–US's ERISA plan. *See Engelhardt,* 139 F.3d at 1351 (explaining that a plaintiff's "claim for benefits under the policy confirms [the plaintiff's] status as a plan beneficiary"); *Bridges,* 132 F.Supp.2d at 1328 ("[A] plan beneficiary [has] the requisite standing.").

For the third requirement, SSL–US and SSL meet the definition of ERISA entities. The Eleventh Circuit has defined ERISA entities as "the employer, the plan, the plan fiduciaries, and the beneficiaries under the plan." *Morstein,* 93 F.3d at 722 (citing *Travitz v. Northeast Dept. ILGWU Health & Welfare Fund,* 13 F.3d 704, 709 (3d Cir.), *cert. denied,* 511 U.S. 1143, 114 S.Ct. 2165, 128 L.Ed.2d 888 (1994)). SSL and SSL–US, as Kirkland's employer, are ERISA entities.

On the fourth and final requirement, Kirkland's Complaint seeks compensatory damages for each state law cause of action. Each count also specifically claims that SSL and SSL–US failed to pay the severance benefits that Kirkland claims he is owed under Procedure 16 and Procedure

30. The *Butero* court explained that "a claim for benefits due under a plan" will suffice to show that a defendant is seeking compensatory relief similar to the relief available under 29 U.S.C. § 1132(a). 174 F.3d at 1212 (citing *Engelhardt*, 139 F.3d at 1354; *Franklin*, 127 F.3d at 1029). Kirkland's Complaint satisfies the fourth *Butero* requirement for complete preemption. *See id.* at 1212 (listing all four requirements).

■ The court concludes that Kirkland's claims meet all the requirements for complete ERISA preemption. Complete preemption also provides an alternative basis for federal jurisdiction in this case, supplementing the Defendants' reliance on diversity jurisdiction. Claims that are completely preempted by ERISA are also defensively preempted.[19] *Id.* at 1215 (citing *McClelland v. Gronwaldt*, 155 F.3d 507, 517 (5th Cir.1998)); *Hardy*, 135 F.Supp.2d at 1183–84. "[S]tate law claims that are defensively preempted by ERISA must be dismissed." *Hardy*, 135 F.Supp.2d at 1184 (citing *Butero*, 174 F.3d

at 1212). Accordingly, Kirkland's state law claims that involve Procedure 16 and Procedure 30 are due to be DISMISSED with prejudice.

*The September 23, 1999 Contract*

■ Kirkland's Complaint does have one wrinkle in it that the court must address. He also seeks severance benefits under his September 23, 1999 contract[20] with SSL–US's predecessor. Under the terms of the contract, if SSL–US terminated Kirkland's employment within the first six months of his transfer from Dothan to Eufaula, Kirkland will "be entitled to [his] severance." The question thus presented is whether this contract provides Kirkland with claims against SSL and SSL–US that are independent of his ERISA-preempted state law claims. The court concludes that the answer is no, and that ERISA preempts Kirkland's claims involving his September 23, 1999 contract with SSL–US's predecessor.

The court first looks to the language in 29 U.S.C. § 1144(a). The statute states

---

**19.** The Supreme Court has concluded that state law breach of contract and fraud claims are defensively preempted by 29 U.S.C. § 1144(a). *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 43, 47–48, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (listing state law claims and concluding that they are preempted by § 1144(a)). Section 1144(a) of ERISA also defensively preempts state law claims for deceit and fraudulent deceit, conversion, and unjust enrichment. *See Franklin v. QHG of Gadsden, Inc.*, 127 F.3d 1024, 1025–26 (11th Cir.1997) (deceit and fraudulent deceit claims preempted); *Great–West Life & Annuity Ins. Co. v. Smith*, 180 F.Supp.2d 1311, 1313–14 (M.D.Fla.2002) (conversion claims preempted); *Northwestern Mut. Life Ins. Co. v. Resolution Trust Corp.*, 848 F.Supp. 1515, 1519 (N.D.Ala.1994) (unjust enrichment claims preempted).

**20.** The court is satisfied that Kirkland and SSL–US had a valid contract. Under Alabama law, "[t]he requisite elements of [a con-

tract] include: an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract." *Ex parte Grant*, 711 So.2d 464, 465 (Ala.1997) (quoting *Strength v. Ala. Dep't of Fin., Div. of Risk Mgmt.*, 622 So.2d 1283, 1289 (Ala. 1993)). The September 23, 1999 letter to Kirkland constitutes an offer, and John Joyce, on behalf of SSL–US's predecessor, specifically states that the letter is "the company's offer." Kirkland's signature acknowledges his acceptance. For consideration, Kirkland received, among other things, a $20,000 relocation bonus, and SSL–US's predecessor received Kirkland's agreement to transfer to Eufaula. Kirkland's signature, just under the line stating "I acknowledge receipt of this agreement and agree to all the terms within" is evidence of his assent to the contract terms. John Joyce, on behalf of SSL–US's predecessor, authored the terms and signed the letter on behalf of the company, acknowledging the company's assent to the terms as well.

that "the provisions of this subchapter ... shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). In *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), the Supreme Court explained the expansive scope of the preemption codified in § 1144(a):

> The breadth of [§ 1144(a)'s] pre-emptive reach is apparent from that section's language. A law "relates to" an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan.

The Eleventh Circuit further explained that "[d]efensive preemption defeats claims that seek relief under state-law causes of action that 'relate to' an ERISA plan." *Butero*, 174 F.3d at 1215 (citing *Lordmann Enters. v. Equicor, Inc.*, 32 F.3d 1529, 1532 (11th Cir.1994)).

The court must determine whether Kirkland's state law claims involving his September 23, 1999 contract relate to an ERISA plan, particularly Procedures 16 and 30. The contract provision at issue states simply that "[i]n the event you are terminated by [SSL–US] prior to the end of the initial six (6) month period [after Kirkland's transfer to Eufaula] for any reason other than cause, you will also be entitled to your severance." September 23, 1999 Contract, ¶ 6. The contract does not define "severance" within the four corners of the written instrument. Kirkland has not introduced any evidence suggesting that SSL–US maintained an additional severance plan outside of Procedure 16 or Procedure 30. From the parties' submissions, the only severance benefits that SSL–US provided to its employees were the benefits under Procedure 16 and Procedure 30. Accordingly, the court can only interpret the contract language in Paragraph 6 to mean that, if SSL–US terminates Kirkland in the initial six month period after his transfer to Eufaula, then

SSL–US is bound contractually to pay Kirkland any severance he may be entitled to under the ERISA severance benefits plan of Procedure 16 and Procedure 30. *See Ex parte Dan Tucker Auto Sales, Inc.*, 718 So.2d 33, 36 (Ala.1998) ("Parties to a contract are bound by pertinent references therein to outside facts and documents."); *Home Ins. Co. v. Pettit*, 225 Ala. 487, 143 So. 839, 841 (1932) ("To properly construe any writing, constituting the memorial of a contract between parties, the first important canon of construction is to ascertain, if possible, the real intention of the contracting parties.... Words employed in the contract should be given their plain, ordinary, everyday meaning, unless ... the words were used in some technical sense.").

Kirkland's contract cannot be understood and SSL–US cannot fulfill its duties under the contract without reference to Procedure 16 and Procedure 30. Accordingly, Kirkland's contract "relates to" SSL–US's ERISA employee welfare benefit plan, specifically Procedure 16 and Procedure 30. Under Eleventh Circuit jurisprudence, Kirkland's state law claims involving the September 23, 1999 contract are preempted by ERISA. *See Butero*, 174 F.3d at 1215. Other federal court decisions from around the country support this court's reasoning and analysis regarding the September 23, 1999 contract.

For example, in *Fort v. St. Paul Fire & Marine Ins. Co.*, No. Civ. 01–2344, 2002 WL 1127657, at *3 (D.Minn. May 28, 2002), the court held that a separate contract, similar to Kirkland's, was not related to a company's ERISA severance plan when the separate contract could be construed and interpreted *without* reference to the ERISA severance plan. Following the *Fort* court's logic, a contract is related to an ERISA severance plan if the contract

can only be interpreted by referencing the company's ERISA severance plan. *See id.*[21]

In *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290, 1294 (5th Cir.1989), the Fifth Circuit concluded that ERISA preempted a plaintiff's breach of contract claim regarding the breach of an alleged oral contract to provide pension benefits. Specifically, the Fifth Circuit explained:

> Cefalu claims he is merely seeking recovery from Goodrich pursuant to a valid oral contract unrelated to the ERISA plan. Therefore, Cefalu contends that since his state law claim does not "relate to" an employee benefit plan, it is not preempted by ERISA. This contention is without merit.

*Id.* at 1292–93. The *Cefalu* court reasoned that in order to compute the damages that Cefalu would be entitled to if he prevailed on his breach of contract claim, the court necessarily would have to refer to Goodrich's ERISA benefit plan. *Id.* at 1294. "Thus, the precise damages and benefits which [Cefalu] seeks are created by the Goodrich employee benefit plan." *Id.* Using this reasoning, the court found that Cefalu's breach of contract claim was related to Goodrich's ERISA plan and was preempted. *Id.*

Like the plaintiff in *Cefalu*, Kirkland is using his breach of contract claim and other common law claims relating to his September 23, 1999 contract as an attempt to recover the benefits he claims SSL–US

owes him under Procedure 16 and Procedure 30. Kirkland's claims involving the contract thus "relate to" Procedure 16 and Procedure 30 "in the 'broad commonsense meaning' of [the phrase "relates to"] and [are] preempted by ERISA." *Pane v. RCA Corp.*, 667 F.Supp. 168, 172 (D.N.J. 1987) (quoting *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985)). In *Pane*, the court addressed the question of whether a claim for breach of contract was preempted by ERISA. *Id.* The plaintiff claimed that the defendant breached a separate contract in which the defendant promised to include the plaintiff in the company's severance plan. *Id.* The court found that ERISA preempted such a claim because "the dispute over this alleged non-ERISA agreement is closely tied to the issue of plaintiff's inclusion in the severance plan." *Id.* Due to the close relationship between the company's ERISA severance plan and the plaintiff's separate contract with the defendant, the court found that ERISA preempted the plaintiff's breach of contract claim. *Id.*

The court concludes that Kirkland's breach of contract claim and other state law claims involving his September 23, 1999 contract with SSL–US's predecessor are defensively preempted by ERISA because the claims "relate to" an ERISA employee welfare benefit plan. These claims are due to be DISMISSED.

*Administrative Exhaustion*[22]

---

**21.** The court does not need to address the question of whether the September 23, 1999 contract constitutes an ERISA "employee benefit welfare plan." Regardless of the answer to that question, the contract, as either simply a contract or an ERISA plan, can only be construed with reference to Procedure 16 and Procedure 30. As a result, the contract "relates to" an ERISA plan, and claims involving the contract are preempted.

**22.** As explained above, all of Kirkland's state law claims are preempted by ERISA and are due to be dismissed with prejudice. Consequently, in resolving the issue of whether the Defendants' Motion to Dismiss is due to be granted, the court need not reach the question of whether Kirkland must exhaust his administrative remedies before pursuing legal action. The court notes, however, that Judge Thompson, in his decision in *Hardy*, granted the plaintiffs the opportunity to amend their complaint to add statutory ERISA claims af-

Under Eleventh Circuit jurisprudence, "a plaintiff must exhaust a plan's administrative remedies before bringing an ERISA suit." *Curry v. Contract Fabricators Inc. Profit Sharing Plan*, 891 F.2d 842, 846 (11th Cir.1990) (citing *Mason v. Continental Group, Inc.*, 763 F.2d 1219, 1227 (11th Cir.1985), *cert. denied*, 474 U.S. 1087, 106 S.Ct. 863, 88 L.Ed.2d 902 (1986)). The *Curry* court specifically explained that *Mason*[23] should not be read "as overruling well-established exceptions to the exhaustion requirement." *Id.* at 846. Indeed, Eleventh Circuit case law excuses the exhaustion requirement in two circumstances: "only when [1] 'resort to administrative remedies would be futile or the remedy inadequate,' *Counts*, 111 F.3d at 108, or [2] where a claimant is denied 'meaningful access' to the administrative review scheme in place, *Curry*, [891 F.2d at 846–47]." *Perrino*, 209 F.3d at 1315. It is undisputed that Kirkland has not filed an administrative claim with SSL–US.

Kirkland argues that the exhaustion requirement should be excused in this case for two reasons. First, he contends that SSL–US failed to establish an administrative appeals process for employees' benefits claims under Procedure 16 and Procedure 30. Second, Kirkland asserts that engaging in any administrative appeals process would be futile. The court finds both of these contentions to be without merit.

"Pursuant to ERISA, employers must establish procedures for reviewing employees' claims under their employee benefit plans." *Byrd v. MacPapers, Inc.*, 961 F.2d 157, 160 (11th Cir.1992) (citing 29 U.S.C. § 1133).[24] Kirkland claims that SSL–US failed to establish administrative review procedures for claims under Procedure 16 and Procedure 30, and, as a result, he should not have to comply with the exhaustion requirement. The Eleventh Circuit dealt squarely with this issue in *Perrino*.

In *Perrino*, the court analyzed the question of whether there should be a third exception to the exhaustion requirement:

ter the court dismissed their state law claims. *See Hardy*, 135 F.Supp.2d at 1185. If the court considers granting the same opportunity to Kirkland, then the question of administrative exhaustion is fairly before the court. If Kirkland does not need to exhaust his administrative remedies, he may simply continue this action by amending his Complaint to add ERISA claims. If Kirkland is instead required to exhaust his administrative remedies, then he must do so before filing a new lawsuit.

23. In *Mason*, the Eleventh Circuit held that "[c]ompelling considerations exist for [requiring] plaintiffs to exhaust administrative remedies prior to instituting a lawsuit." 763 F.2d at 1227. These considerations include "reduc[ing] the number of frivolous lawsuits under ERISA, minimizi[ng] the cost of dispute resolution, enhanc[ing a] plan's trustees' ability to carry out their fiduciary duties ... by preventing premature judicial intervention ..., and allow[ing] prior fully considered actions by ... trustees to assist courts if the

dispute is eventually litigated." *Id.* The *Mason* court did not, however, expressly state if there are any exceptions to the exhaustion requirement.

24. 29 U.S.C. §§ 1021(a)(1) & 1022 require employers to provide employees with summary plan descriptions of any employee benefit plan in which the employee is participating. The summary plan description "shall contain ... the procedures to be followed in presenting claims for benefits under the plan." 29 U.S.C. § 1022(b). Federal regulations mandate that "[e]very employee benefit plan shall establish and maintain reasonable procedures governing the filing of benefit claims." 29 C.F.R. § 2560.503–1(b). The regulations further state that "[t]he claims procedures for a plan will be deemed to be reasonable only if—... (2) A description of all claims procedures ... and the applicable time frames is included as part of a summary plan description." 29 C.F.R. §§ 2560.503–1(b) & (b)(2).

Appellants argue that we should recognize a new exception to our exhaustion requirement; namely, that an employer's noncompliance with ERISA's technical requirements (for example, creating a summary plan description, or *delineating a formal claims procedure*) should excuse a plaintiff's duty to exhaust administrative remedies.

．　　．　　．　　．　　．

Before the district court, BellSouth conceded that the [ERISA plan], at the time of Appellants' employment and termination, did not comply strictly with all of ERISA's regulations.... [A]lthough the [ERISA plan] contained a detailed provision explaining the terms and conditions under which employees could receive termination allowances as well as a detailed grievance and arbitration procedure available for "any" employment-related grievance, these provisions did not state explicitly that employees could file termination allowance claims if they were denied by the plan administrator.

Because of these technical deficiencies, Appellants contend that the ERISA exhaustion requirement ought to be waived. They claim that because the [ERISA plan's] provisions do not explicitly aver that termination allowance claims can be filed or receive review and arbitration, the [ERISA plan] does not contain a "reasonable" claims procedure. Appellants also assert that because BellSouth did not promulgate and distribute a summary plan description, they should not be compelled to exhaust the plan's administrative remedy procedures.

We find Appellants' arguments unpersuasive.

209 F.3d at 1316 (emphasis added) (footnote omitted). The court noted several reasons for finding the appellants' arguments unmeritorious. *See id.* at 1317.

First, the court found that the appellants' contentions in *Perrino* were "exceedingly technical" and that the plan's failure to follow ERISA regulations was "technical noncompliance." *Id.* The ERISA plan in *Perrino*, like Procedure 16 and Procedure 30, did "contain specific provisions which explain employee eligibility for termination allowances." *Id.* Second, the *Perrino* court found that other BellSouth employees "had used the [ERISA plan's] grievance and arbitration procedure to challenge the denial of termination pay allowances." *Id.* This factor is also present in the instant case, for all of the *Barnes* plaintiffs have filed an administrative claim for their severance benefits despite the fact that Procedure 16 and Procedure 30 do not outline the administrative claim process. Finally, the Eleventh Circuit noted that one of the *Perrino* plaintiffs, Angelo Perrino, "had specific knowledge of the [ERISA plan's] grievance and arbitration procedure yet never filed a grievance." *Id.* In the instant case, as explained previously, Kirkland, through his attorneys, has knowledge of how to file an administrative claim with SSL–US. Both of Kirkland's attorneys also represent the *Barnes* plaintiffs.[25]

This court, bound by the *Perrino* precedent, concludes, as the *Perrino* court did, that "the [ERISA plan's] administrative scheme was available to [Kirkland] for the [administrative] review ... of [his] ERISA termination allowance claims, and that if the process had been invoked, [Kirkland] could have received" an administrative review of his claims by SSL–US, fulfilling the exhaustion requirement. *Id.* Additionally, despite the lack of technical compliance with federal ERISA regulations, the court concludes that SSL–US has not denied Kirkland "meaningful access" to the

---

**25.** *See supra* pages 1339–1340 (discussing Kirkland's attorneys' knowledge of the procedure for filing a claim for severance benefits with SSL–US).

administrative process. *See id.* ("Our prior precedent makes clear that the exhaustion requirement for ERISA claims should not be excused for technical violations of ERISA regulations that do not deny plaintiffs meaningful access to an administrative remedy procedure through which they may receive an adequate remedy."). Through consultation with his attorneys, or even by contacting company officials, Kirkland could have discovered the proper way to file an administrative claim for severance benefits. From a review of the *Barnes* plaintiffs' claims and pleadings, a simple letter to Haviland, to SSL–US's general counsel, or to SSL–US's retained counsel would have started the administrative review process. Haviland explained the process for appealing any adverse ruling on an employee's administrative claim for benefits in the letter he sent to the *Barnes* plaintiffs denying their first administrative claim.

Kirkland's second argument is that any administrative process he undertakes with SSL–US will be futile and, thus, he should be excused from the requirement that he exhaust his administrative avenues before filing a civil action. The Eleventh Circuit recognizes an exception to the exhaustion rule in cases where the "resort to administrative remedies would be futile or the remedy inadequate." *Counts,* 111 F.3d at 108. "A plaintiff must make a 'clear and positive showing of futility' before the court may suspend the exhaustion requirement." *Engelhardt v. Paul Revere Life Ins. Co.,* 77 F.Supp.2d 1226, 1233 (M.D.Ala.1999) (quoting *Springer v. Wal–Mart Assoc. Group Health Plan,* 908 F.2d 897, 899 (11th Cir.1990)). The court con-

cludes that Kirkland has failed to meet this burden.

Kirkland has made no attempt to pursue an administrative claim. His attorneys have knowledge of the proper procedure to follow to file an administrative claim, yet they have not filed a claim. There is no evidence that SSL–US will summarily deny Kirkland's claims without giving him an adequate opportunity to explain his position, especially in light of the Eleventh Circuit's decisions in *Bedinghaus* and *Harris v. Pullman Standard, Inc.,* 809 F.2d 1495 (11th Cir.1987).[26] *See Stephenson v. Provident Life & Accident Ins. Co.,* 1 F.Supp.2d 1326, (M.D.Ala.1998) (DeMent, J.) (explaining that any argument alleging that a company "made up its corporate mind to ignore its own definition [of eligibility] and to cast about for every conceivable, illogical, unreasonable reason to attempt to justify its decision to deny ... benefits" must be supported by evidence). Any review of an administrative claim filed by Kirkland will have to address these precedents. Furthermore, no party in either this case or the two companion cases has fully exhausted a severance benefits claim *on the merits.*[27] As a result, SSL–US has not had the opportunity to demonstrate its reasoning and analysis in the handling of an appeal of a denial of benefits.

Based on the parties' submissions, the court also notes that SSL–US has done nothing to hinder or restrict Kirkland's access to the administrative process. SSL–US plainly explained the administrative review process in letters to the *Barnes* plaintiffs, who also are represented by

---

**26.** While Haviland may have limited the amount of time in which claimants may appeal any adverse administrative decision by SSL–US regarding a claim for benefits, the plain language of both Procedure 16 and Procedure 30 does not appear to set a limitations period for the filing of an initial claim by an employee.

**27.** In *Barnes,* Haviland stated that he denied the *Barnes'* plaintiffs' administrative appeal because it was untimely. Haviland did not address the merits of the appeal.

Kirkland's attorneys. SSL–US explained its reasons for denying the *Barnes'* plaintiffs' first administrative claims for benefits in a letter as well. The court finds that there has been no attempt by SSL–US to deny Kirkland meaningful access to SSL–US's administrative review process.

### Conclusions

The court reaches the following conclusions:

1. Procedure 16 and Procedure 30 constitute an ERISA employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1).

2. Kirkland's state law claims against SSL–US, to the extent they involve Procedure 16 and Procedure 30, are completely preempted by ERISA.

3. Kirkland's state law claims against SSL–US, to the extent they involve his September 23, 1999 contract with SSL–US's predecessor, are defensively preempted by ERISA.

4. Kirkland failed to exhaust the administrative remedies provided by SSL–US, and the facts of his case do not fall under any of the exceptions to the ERISA exhaustion requirements recognized by the Eleventh Circuit. Since Kirkland must exhaust administrative remedies before bringing an ERISA suit, and since the court has found that he has not done so, it would be inappropriate to allow him to amend to state an ERISA claim at this time. After all, an administrative claim might be paid. This suit will be dismissed without prejudice to Kirkland bringing an ERISA suit at a later time, if he is unsuccessful in his administrative claim with SSL–US.

The court finds that the Defendants' Motion to Dismiss is due to be GRANTED and Kirkland's state law claims are due to be DISMISSED with prejudice.

A separate Order and Final Judgment will be entered in accordance with this Memorandum Opinion.

### ORDER AND FINAL JUDGMENT

In accordance with the Memorandum Opinion entered on this day, the court hereby ORDERS that:

1. The Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. # 16) is GRANTED.

2. The Plaintiff's state law claims are DISMISSED with prejudice.

3. FINAL JUDGMENT is entered in favor of the Defendants, SSL Americas, Inc., and SSL U.S. Manufacturing, LLC, and against the Plaintiff, Kipley Wess Kirkland on all state law claims. This case is DISMISSED, without prejudice to the Plaintiff filing an ERISA suit after exhausting administrative remedies, if he is unsuccessful with his administrative claim. Costs are taxed against the Plaintiff.